340 P.2d 566

Madeleine ANDERSON, Appellant,

v.

CITY VAN & STORAGE COMPANY, Inc., a corporation, and Bruce Dusenberry, Appellees.

No. 6491.

Supreme Court of Arizona.

June 10, 1959.

Rehearing Denied July 7, 1959.

Lewis, Roca, Scoville & Beauchamp, John P. Frank, Phoenix, and Richard Duffield, Tucson, for appellant.

Udall & Udall, and Charles E. Ares, Tucson, for appellees.

PHELPS, Chief Justice.

This is an appeal from the orders and judgments of the superior court entered herein against plaintiff and in favor of defendants on December 28, 1956, and from its judgment entered herein against plaintiff, and in favor of Bruce Dusenberry on January 16, 1957.

This litigation arose out of a transaction wherein Madeleine Anderson (hereinafter called plaintiff) entered into a written contract with the City Van & Storage Company, Inc., at Tucson, Arizona, (hereinafter called defendant) for the storage of certain household goods on a monthly rental basis. These goods consisted of furniture, some of which was antique, carpeting, draperies, chinaware, sterling silver, clothing and other personal effects, all of which she testified would cost $18,000 to replace.

The contract contained a clause limiting liability of defendant to thirty cents per pound if it should be destroyed by fire or otherwise lost (except by accident). Plaintiff claims she did not read the contract which, of course, is no defense to an action on contract. She testified that defendant represented to her on different occasions that his building was fireproof, which induced her to enter into the contract with him, and that he stated insurance was unnecessary, and as a result of said representation she was not concerned about fire damage. Although she states after she was back in New York she received a contract from defendant for her signature, in which her name had been changed from that of her husband (from whom she had just been divorced), to that of Madeleine Anderson. She thinks she signed the original contract and returned it to defendants although she is not sure she did. She testified that in this contract there was a place provided for her to indicate if she desired insurance coverage on any part of the goods she had stored with defendant, and that she indicated therein that she desired coverage of $2,000 on the three barrels which she testified contained china and silverware and other personal effects. She further testified, however, that because of the representations of Bruce Dusenberry that the storage building was fireproof she was not concerned with fire coverage but the reason she signed that contract was that she want-

ed this insurance for all-purpose breakage or theft insurance.

Regardless of whether Bruce Dusenberry, president and manager of defendant corporation, made any representations to plaintiff concerning the fireproof character of the warehouse, which she claims induced her to store her household goods and furnishings with defendant, and regardless of her allegation that she notified defendant after the fire occurred of her cancellation of such contract, these allegations appear to be merely incidental to laying a predicate for an action based upon negligence. There can be no doubt that the case was tried upon the theory of negligence.

Plaintiff first assigns as error the refusal of the trial court to direct a verdict for her and against defendant and to enter a judgment in her favor, notwithstanding the verdict. On the question of a directed verdict the limit of the court's authority in this case would be to direct the jury that the defendant was guilty of negligence as a matter of law and submit to it only the question of the amount of the damages to be awarded.

■ Viewing the first assignment in this light it will be necessary to examine the evidence bearing upon the question of negligence, and in doing so we must view it in the light most favorable to sustaining the verdict of the jury which, in this case, consisted of answers to interrogatories. So far as we were able to determine from a careful reading of all of the evidence there are no material conflicts in it relating to the question of negligence.

The evidence discloses without contradiction that the defendant's building was not fireproof. It further discloses that it was not a class I fire resistance structure. In fact, the undisputed testimony of the witness Herreras, architect and structural engineer, is to the effect that it does not meet all of the specifications of a class III building of this type. There were no partitions in the attic separating each 2,500 square feet of space. He stated a class III type business or any type used as a commercial or industrial building requires the attic spacing of each 2,500 square feet with partitions of one-half hour fire resistance. Neither was the ceiling nor any of the partitions inside the building made of material with a one hour fire resistance required in a class III type building. The glass blocks in the walls of the building he stated had a maximum fire resistance of only fifteen minutes, depending on the intensity of the fire. He stated that the partitions in the building consisted of flexboard on one side of two by four studs. The flexboard itself would have a fire resistance of twelve to fifteen minutes.

The evidence of Mr. Herreras is further to the effect that the incinerator was homemade and did not conform with standard requirements adopted by the Board of Fire

Underwriters, and "the Uniform Building Code which is published by the Pacific Building on official conference and the trade catalogue known to the profession as Sweet's Catalogue, which is made of manufacturers' catalogues and specifications." He testified that these publications are generally accepted in this country as being the right way to build incinerators.

He pointed out many departures from standard construction, chief among which were that the doors were too large and did not provide for any control of the doors being kept closed. It was not built to provide for any adjustment of air for combustion. There was no screen or spark arrester, nor were there any baffles or chambers to take care of sparks or any particles as generally used in commercial incinerators. He testified that there had been a wire mesh screen originally inserted in the brick joints four to six inches from the top of the flue, which was just an ordinary piece of screen wire that had burned out and had been replaced by a heavy screen mesh ⅛ to 3/16 inches in width and ⅝ to ¾ inches in length, laid on top of the remaining burned portion of the original screen, and was smaller by one inch on the north side, ¾ inch on the south and ⅛ inch smaller on the east side and 1/16 to ¼ inch smaller on the west side of the flue.

The evidence further shows that there was a high wind blowing from the east on the day the fire occurred. Readings taken at the airport showed a velocity at 9:29 a. m. of 25 mph with gusts to 32 mph; at 10:03 a. m. 28 mph with gusts to 34 mph; at 10:28 a. m. 22 mph with gusts to 30 mph; at 11:06 a. m. 27 mph with gusts to 36 mph. The meteorologist stated that with a large scale low pressure, as existed then, the velocity of the wind at the place of the airport would be less than at the fire, where the wind was from the east as it was on that morning. This, he said, was true because of the location of surrounding mountains which affect both the current and velocity.

The evidence further shows that there were wooden and cardboard boxes along the fence. It is impossible to determine to which fence reference is made. It is clear that on the north side of the warehouse, at about the center thereof, there is a concrete block structure attached to the warehouse. Immediately to the east of this structure there were three lift vans about three or four feet north of the warehouse. These lift vans were six to eight feet in height and eight to eight and one-half feet in length, made of wood. Immediately east of these lift vans there was a stack of boxes three to six feet high, ten to twelve feet deep and twenty feet long. There was a walkway between the boxes and the north wall of the warehouse. It was in these boxes that the fire originated. The incinerator was located in a northeasterly direction therefrom. There is nothing in the record from which its exact distance from the spot the

fire originated can be determined. One of the counsel mentioned sixty-seven feet I believe. Judging from the size of the lot and the size of the building, that cannot be too much in error.

The witness Oyler was burning old trash and papers in the incinerator. He stated that he did this by removing the trash and papers from the drum and putting it in the incinerator in handfuls, and that he would close the door after each handful he threw in. He said Robert Brown was carrying the drums of trash to him from along the fence and he was burning it; that he had been engaged in this work about forty-five minutes when the fire started. Mr. Brown, however, testified that prior to the time the fire occurred he had been cleaning up the packing room and had taken some waste material outside to stack alongside the fence where they kept it, and noticed Mr. Oyler was burning the waste material in the incinerator "so I carried my drum down to the incinerator there. I emptied it into the incinerator and I started back to the packing room."

"Q. Did you personally empty it into the incinerator or did Mr. Oyler do it? A. I did.

"Q. What was Mr. Oyler doing while you were emptying your box into the incinerator? A. He was back up to the barrels along the fence where we had the waste paper in drums, getting another drum, as far as I know.

"Q. Getting more material to burn? A. That's right.

"Q. How fast was the wind blowing when you did this? A. I have no way of knowing how fast. It was a brisk breeze."

The employees were instructed to burn this trash only when the wind was blowing from east to west. This was done not as a safety measure but because of complaint from a motel located just east of the warehouse property. Later the following questions were asked Mr. Brown:

"Q. Now I believe you said that you carried a barrel of material, paper and such,—just paper or did it have cardboard in it? A. No, sir, just paper.

"Q. And you loaded it all in the incinerator yourself? A. That's right.

"Q. How long did it take you to load that barrel of trash into the incinerator? A. Approximately 3 or 4 minutes.

"Q. Did you have the doors open when you were loading it? A. They had to be opened to load it, yes.

"Q. Was there a fire? A. There was a fire, yes.

"Q. Which direction was the wind blowing from? A. Blowing from the east to west."

The witness Loris, bookkeeper for defendant, testified that he went outside as soon as the fire was reported and that the wind was blowing toward the building from the incinerator. He said on cross-examination that it could be that he got his impression about the direction of the wind "with the idea the fire was there and where else would it come from?".

Considering the testimony of the witness Brown, to the effect that he emptied a barrel of trash into the incinerator which required three or four minutes, and that the doors were open during the time he was doing it; that when he turned away from the incinerator he looked back at the chimney of the incinerator as a precaution and saw no sparks, but turned immediately and saw the fire and that it was then "just a small ball. It had just started" convinces us, when considered with the other evidence in the case above related, that it was of such a character as not only to have justified the trial court in finding that the defendant was negligent, and that such negligence was the proximate cause of the damages suffered by plaintiff, but that it was compelling. The witness Herreras testified there was no draft provided at the bottom of the incinerator with exception of one or two bricks left open and when the doors were left open while the wind was blowing at a velocity of 23 mph, it would blow down the flue and blow the burning rubbish or embers out of the door.

To summarize, first defendant accepted plaintiff's household goods for storage in a building which, according to the undisputed evidence, did not measure up even to a class III fire resistance structure according to the standard requirements adopted by the Board of Fire Underwriters. Secondly, the incinerator provided for disposing of trash, paper, etc. was defective in practically every major requirement of standard construction, including a total absence of refractory material in the firebox, throat and chimney; the doors were too large and there were no controls for keeping them closed nor adjustment of air for combustion, and no spark arrester or baffles or chambers to take care of sparks or other particles, and no provision for draft below the door. Thirdly, the cleaning-up process by burning trash, paper, etc. on a day when the wind was blowing 20 to 30 mph and gusts up to 35 mph at a time when the yard had quite an accumulation of boxes, both wooden and pasteboard, and drums of trash, etc., some of which were within four feet of the north wall of the warehouse approximately below the glass brick in the north wall. Fourth, the climactic circumstance of all, i. e., the act of Brown in emptying a barrel of trash into the incinerator which required 3 or 4 minutes, during all of which time he said he kept the doors open in spite of the fact that high wind was blowing from the east. Herreras stressed the necessity of keeping

the doors closed at all times while burning trash.

The fact that when Brown turned away from the incinerator after looking at the top of the flue to see if any sparks were being emitted from it, immediately saw a small ball of fire in the pile of boxes stacked just east of the lift vans located in a southwesterly direction from the incinerator, should have left no doubt in the mind of the trial judge as to the source and cause of the fire. There was no evidence of any other source from which it could have emanated.

■ We therefore hold that the trial court committed reversible error in refusing to instruct the jury that defendant City Van & Storage Company, Inc., a corporation, was negligent as a matter of law. It should have so instructed the jury and submitted to it the question only of the amount to be awarded. It follows as a matter of course that plaintiff's motion for a new trial should have been granted upon the ground that the verdict was contrary to the law and to the evidence.

■ We are of the view that the question of the negligence of Bruce Dusenberry should have been submitted to the jury for its determination. We believe his failure to control, manage and provide a building for the storage business with a higher fire resistance than he furnished, and providing an incinerator that was defective in every major detail as it relates to the corporation amounted to a failure to exercise that care which a reasonably careful owner of similar goods would exercise as required under the provisions of A.R.S. § 44–721. These facts, together with other circumstances above related, required, according to our view, that the question of Dusenberry's negligence should also have been submitted to the jury under proper instructions for their determination as to whether he was individually liable in damages for whatever loss plaintiff sustained.

■ We find no merit to plaintiff's fourth assignment of error. In it counsel claims the court erred in rejecting a photograph of a woodpile alongside one of the wire fences enclosing the yard to the warehouse. The picture was taken after the fire. The wood did not burn. It might have had some probative value as an example of the unkept character of the entire premises but the woodpile appearing in the photograph certainly contributed nothing to the loss, and we believe it was too remote to justify its admission in evidence.

■ Under the rule laid down in State v. Lane, 69 Ariz. 236, 211 P.2d 821, it was clearly error to refuse to permit counsel for plaintiff to cross-examine the witness Homer Oyler after he declared surprise at the testimony of Oyler, apparently entirely different from that given in a deposition shortly after the fire occurred. Counsel

announced that he did not seek to impeach the witness but merely to refresh his memory which was held proper in the Lane case, supra. As we view it there is nothing ambiguous in the language on that point in the Lane case which held such testimony was admissible.

█ It was error to admit evidence concerning the claimed inefficient manner in which the Catalina Fire Department handled its equipment at the fire. It should not have been admitted. However, if anything could have removed any impressions they received as a result of its reception, we believe the very explicit instruction on the matter given by the court should have had that effect.

In view of the fact that a new trial must be had, we call attention to the fact that there is an unequivocal contradiction in the answers of the jury to interrogatories No. 3 and No. 4 submitted. The judge should not have accepted them.

Judgment reversed and remanded for a new trial upon the question of the amount of damages only as to the corporation, and to the question of negligence as to the defendant Bruce Dusenberry.

STRUCKMEYER, JOHNSON and BERNSTEIN, JJ., and LAURENS L. HENDERSON, Superior Court Judge, concur.

Justice UDALL, being disqualified, the Honorable LAURENS L. HENDERSON, Judge of Superior Court, Maricopa County, was called to sit in his stead and participated in the determination of this appeal.